**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

**Case No. 0:22-cv-62219-WPD**

JAMIL HINDI, individually and on behalf of all others similarly situated,

    Plaintiff,

v.

MODANI FORT LAUDERDALE, LLC,

    Defendant.

**DEFENDANT'S PARTIAL MOTION TO DISMISS**

## TABLE OF CONTENTS

I. Introduction ........................................................................................................................ 1

II. Factual Background .......................................................................................................... 1

III. Standard of Review ........................................................................................................... 2

IV. Argument: The Court Should Dismiss the FTSA Count Because the Statute
Violates Federal and State Constitutions .......................................................................... 2

    A. Strict Scrutiny, Not Intermediate, Applies Because the FTSA Is a Content-Based
Regulation of Only a Disfavored Subset of Commercial Speech ....................... 3

    B. Like Most Speech Restrictions, the FTSA Fails Strict Scrutiny ......................... 6

    C. The FTSA Fails Intermediate Scrutiny Because It Is Far More Extensive than
Necessary to Accomplish the Government Interest ........................................... 8

V. Conclusion ....................................................................................................................... 10

I.      **Introduction**

In this putative class action lawsuit, Plaintiff Jamil Hindi alleges that Defendant Modani Fort Lauderdale, LLC violated the Telephone Consumer Protection Act (TCPA) and the Florida Telephone Solicitation Act (FTSA) by sending him automated marketing text messages.  Although all his claims will ultimately fail for a host of independent reasons, his FTSA claim must be dismissed now because it is unconstitutional.  In particular, the FTSA violates the First Amendment.  It restricts speech based on its content, so it is subject to strict scrutiny, which it fails.  And even if the FTSA were subject to intermediate scrutiny, it would be unconstitutional.

First, the FTSA does not satisfy the onerous requirements of strict scrutiny.  Initially, scrutiny applies under recent Supreme Court precedent because the FTSA restricts "marketing, that is, speech with a particular content," but not other types of content.  *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 564 (2011).  But the FTSA cannot pass the rigorous requirements of strict scrutiny.  A compelling government interest of the highest order, like combating terrorism, must support a speech restriction subject to strict scrutiny, for example, and curbing the minor annoyance of marketing text messages in not such an interest.  And the FTSA is wildly under and over-inclusive, including because it severely restricts marketing and other communications but permits all manner of non-commercial speech that is more disruptive and annoying.  For disfavored speech, in fact, the FTSA even purports to impose crippling class action liability for communications that consumers *specifically requested*.  But scammers, companies, and political candidates can make *unlimited* calls with *no consent at all*—so long as the subject matter includes speech the legislature finds acceptable (including, of course, speech soliciting political donations).  There is no justification for this disparate speech treatment, so the FTSA fails strict scrutiny.

Nor can the FTSA survive intermediate scrutiny, even assuming it applies.  The statute is not only far more extensive than is necessary to advance the purported government interest (protecting consumers from unwanted communications) but leaves in place unregulated speech that does even more harm to that interest.  The overbroad and poorly tailored speech restrictions of the FTSA thus render the law unconstitutional no matter what level of scrutiny applies.

The Court should grant Modani's motion and dismiss the FTSA claim with prejudice.

II.     **Factual Background**

Plaintiff alleges that he received text messages from Modani beginning in May 2022.  *See* ECF 1 ¶¶ 13-18.  Based on these messages, Plaintiff claims Modani violated the FTSA by

1

contacting him with "an automated system for the selection or dialing of telephone numbers" without first obtaining express written consent. *Id.* ¶¶ 65-67.

Nowhere in the Complaint, notably, does Plaintiff deny that he provided Modani with his phone number directly, or that he was a Modani customer. *See generally id.*

### III. Standard of Review

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Claims based on unconstitutional laws must also be dismissed. *See Ex parte Siebold*, 100 U.S. 371, 377 (1880) ("if the laws are unconstitutional and void, the [federal court has] no jurisdiction of the causes"); *see also Montgomery v. Louisiana*, 136 S. Ct. 718, 724 (2016) (sentence under unconstitutional law is void because state was deprived of authority to impose it).

### IV. Argument: The Court Should Dismiss the FTSA Count Because the Statute Violates Federal and State Constitutions.

Plaintiff's FTSA claim fails because the subsection on which he relies violates the First Amendment.[1] *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) (explaining government generally "has no power to restrict expression because of its message, its ideas, its subject matter, or its content"). That subsection restricts "a person" from making only "a telephonic sales call" (but not calls with non-sales content) if "such call involves [a] an automated system for the selection or dialing of telephone numbers or [b] the playing of a recorded message when a connection is completed to a number called without the prior express written consent of the called party." Fla. Stat. § 501.059(8)(a).

As clarified below, this provision triggers First Amendment scrutiny because it imposes a burden on constitutionally protected speech. *See, e.g.*, *Sorrell*, 564 U.S. at 565. And regardless of which level of scrutiny applies—recent Supreme Court authority mandates strict—the content-based regulation fails. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) ("*AAPC*") (pl. op.) (invaliding commercial speech exception under strict scrutiny because

---

[1] The protection for free speech under the Florida State Constitution is co-extensive with the First Amendment. *See, e.g.*, *Dickerson v. Stuart*, 877 F. Supp. 1556, 1559 n.1 (M.D. Fla. 1995); Fla. Const. art. 1, § 4 ("No law shall be passed to restrain or abridge the liberty of speech . . . .").

2

"[c]ontent-based laws are subject to strict scrutiny."); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (similar); *see also Sorrell*, 564 U.S. at 571-72.

### A. Strict Scrutiny, Not Intermediate, Applies Because the FTSA Is a Content-Based Regulation of Only a Disfavored Subset of Commercial Speech.

To begin with, the FTSA is a content-based regulation of speech subject to strict scrutiny because its prohibition on using an automated system to make calls applies only to "telephonic sales call[s]," Fla. Stat. § 501.059(8)(a), which are defined as telephone calls, text messages, or voicemails sent "for the purpose of soliciting a sale of any consumer goods or services, soliciting an extension of credit for consumer goods or services, or obtaining information that will *or may* be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes," *id.* § 501.059(1)(j) (emphasis added). The FTSA therefore "disfavors marketing, that is, speech with a particular content." *Sorrell*, 564 U.S. at 564. Because its applicability turns on the topic discussed and the message expressed, the statute is content based and thus subject to strict scrutiny. *See Reed*, 576 U.S. at 163 ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed . . . [Such laws] are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.") (cleaned up).[2]

Indeed, the FTSA is not a content-neutral, generally applicable regulation on commercial speech, which might be subject to the less exacting (but still demanding) standard of intermediate scrutiny. In *Central Hudson*, the Court defined "commercial speech" as "expression related *solely* to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980) (emphasis added). The Court reaffirmed that the First Amendment "protects commercial speech from unwarranted governmental regulation," *id.* at 562, but also recognized that, because the government has long regulated commercial transactions, the Constitution "affords a lesser protection to commercial speech than to other constitutionally guaranteed expression," *id.* at 563. Rather than strict scrutiny,

---

[2] Furthermore, another provision in the FTSA prohibiting calls to phone numbers on the state's "no sales solicitation calls" list applies only to "*unsolicited* telephonic sales calls," Fla. Stat. § 501.509(4), which are defined to exclude, among other things, calls by "a newspaper publisher or his or her . . . employee in connection with his or her business," *id.* § 501.509(1)(k). This separate provision therefore "disfavors specific speakers," *i.e.*, non-newspaper marketeers. *Sorrell*, 564 U.S. at 564.

government regulation of commercial speech would have to satisfy intermediate scrutiny. *Id.* at 564.

But the FTSA regulates both commercial *and* non-commercial speech, taking it outside of *Central Hudson*'s orbit. Subsection 8(a) prohibits using auto dialers and pre-recorded messages to make a "telephonic sales call," including a call "for the purpose of . . . obtaining information that will or ***may be*** used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes." Fla. Stat. § 501.059(1)(j) (emphasis added). Information that "may be" used for marketing cuts a wide swath, and could include information such as income level, marital status, political affiliation, and racial ethnicity.

Consider an academic using pre-recorded messages to collect information for research. His speech is not commercial as it does not relate *solely* to economic interests, but it would fall within the plain language of the FTSA. Whereas the prohibition in *Central Hudson* restricted commercial speakers' (electric utilities) commercial message (advertising), *see* 447 U.S. at 558-59, the FTSA extends to *non-commercial* messages from *non-commercial* speakers. So the FTSA requires judicial scrutiny beyond the *Central Hudson* standard.

Nor did *Central Hudson* hold that the government can regulate commercial speech *in a discriminatory manner* without triggering strict scrutiny. And the Supreme Court's recent, controlling *AAPC* decision dictates that content-based regulation of commercial speech is indeed subject to strict scrutiny. That case concerned the legality of a provision of the TCPA dealing with automated and pre-recorded calls (*i.e.*, robocalls)—one that exempted calls "made solely to collect a debt owed to or guaranteed by the United States" but imposed liability on all others for the same calls. *AAPC*, 140 S. Ct. at 2344-45 (quoting statute).

Although communications about debt collection fall within the definition of "commercial speech," the Supreme Court in *AAPC* still applied strict scrutiny, as the law was "as content-based as it gets" because a robocall that says, "pay your government debt" is legal but one that says, "pay your mortgage" is not. *Id.* at 2346. Regulation of commercial speech in a content-discriminatory manner is thus still subject to strict scrutiny. *Id.*; *see also Sorrell*, 564 U.S. at 566 ("[c]ommercial speech is no exception" to the First Amendment's non-discrimination principles).

The Sixth Circuit recently confirmed that *Reed* and *AAPC* stand for that principle. In *City of Troy*—the only circuit decision to address the issue since *AAPC*—the court held that "the intermediate-scrutiny standard applicable to commercial speech under *Central Hudson* applies

4

only to a speech regulation that is content-neutral on its face," but "a regulation of commercial speech that is not content-neutral is still subject to strict scrutiny under *Reed*." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 703 (6th Cir. 2020) (citation omitted). The Sixth Circuit reasoned that *AAPC* had "repudiated the approach taken earlier by" other circuit courts that applied *Central Hudson* even to content-discriminatory regulations of commercial speech. *Id.*

To be sure, several district courts have applied the *Central Hudson* standard to the FTSA, but their reasoning is unpersuasive. Preliminarily, none recognized that the FTSA regulates **both** commercial and non-commercial speech, as explained above. They also misread *Central Hudson* for more than it holds. *Pariseau,* for instance, applied intermediate scrutiny because "neither *Reed* nor *Barr* overturns *Central Hudson*." *Pariseau v. Built USA, LLC*, 2022 WL 3139243, at *6 (M.D. Fla. Aug. 5, 2022). This observation misses the point, however, because *Central Hudson* never stood in opposition to the teachings of *Barr* and *Reed*. Each operates in a different sphere: *Barr* and *Reed* for content-based laws, and *Central Hudson* for content-neutral regulations of commercial speech. *Central Hudson* has never stood for the illogical principle that any regulation of commercial speech, no matter how content- or even viewpoint-discriminatory, needs only satisfy intermediate scrutiny.

*Pariseau* also incorrectly cited *Sorrell v. IMS Health* for the proposition that intermediate scrutiny applied to content-based regulations of commercial speech. But *Sorrell* didn't say that. It held that "a specific, content-based burden on protected expression," *i.e.*, commercial speech, warrants "heightened judicial scrutiny." 564 U.S. at 565. The Court left open exactly what that heightened scrutiny entails but held that the state had to "*at least*" satisfy the *Central Hudson* standard. *Id.* at 572 (emphasis added). The insertion of "at least" is meaningful; as Justice Breyer's dissent in *Sorrell* recognized, the "heightened" scrutiny the majority adopted "suggest[ed] a standard yet stricter than *Central Hudson*." *Id.* at 588 (Breyer, J., dissenting).

Because the statute in *Sorrell* failed even intermediate scrutiny, the Court had no occasion to specify exactly what its "heightened scrutiny" entailed. *See id.* at 571 (majority opinion) ("As in previous cases, however, the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied."). But today, given *AAPC* and *City of Troy*, it's clear that a majority of Supreme Court Justices, and the Sixth Circuit, believe that the appropriate "heightened scrutiny" for content-based regulations of commercial speech is strict scrutiny.

This Court should join them.

5

### B. Like Most Speech Restrictions, the FTSA Fails Strict Scrutiny.

A law survives strict scrutiny only if it is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. It is "the rare case" in which a speech restriction survives strict scrutiny. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015). The "hopelessly underinclusive" FTSA is not that rare case. *Reed*, 576 U.S. at 171.

First, there is no compelling state interest in prohibiting text messages like those Plaintiff allegedly received. Compelling interests are "of the highest order" and include "combating terrorism, protecting election integrity, [and] remedying the effects of past unconstitutional race discrimination." *Williams-Yulee*, 575 U.S. at 445, 446; *Willey v. Harris Cnty. Dist. Att'y*, 27 F.4th 1125, 1131 (5th Cir. 2022). Protecting listeners from negative reactions (such as annoyance or anger) doesn't meet that high bar. *See, e.g.*, *Sorrell*, 564 U.S. at 575 ("Many are those who must endure speech they do not like, but that is a necessary cost of freedom."); *Cohen v. California*, 403 U.S. 15, 21 (1971).

Now consider text messages. Texts do not tie up phone lines, are less intrusive than phone calls, are easy to ignore, and can be deleted or blocked with the press of a button. And texts messages *solicited* by recipients (like Plaintiff) are even less intrusive. The interest served by applying Subsection 8(a) to Modani's speech is thus not compelling. The FTSA fails strict scrutiny for this reason alone.

To be sure, some courts have characterized the FTSA's purpose more broadly as "consumer protection and privacy," *Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*, No. 21-CIV-61493-RAR, 2022 WL 2919260, at *10 (S.D. Fla. May 18, 2022), or "residential privacy and tranquility," *Pariseau*, 2022 WL 3139243, at *6. But even assuming such interests to be compelling, defining the governmental purpose in that way mandates the conclusion that the FTSA is not narrowly tailored because it is both under- and over-inclusive. *See, e.g.*, *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 123 (1991) (Blackmun, J., concurring in the judgment) (explaining that a statute failed narrow tailoring for being both "underinclusive as well as overinclusive"). The FTSA fails strict scrutiny for this independent reason, as well.

As to under-inclusivity, the FTSA is poorly tailored because other kinds of automated text messages could annoy and harass consumers far more intensely than informational commercial texts (particularly those sent at the recipient's request). "A law cannot be regarded as protecting

6

an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002). The FTSA allows all sorts of automated text messages—for example, unlimited debt collection texts messages, text messages soliciting donations from charities or from fringe political candidates with abhorrent and salacious platforms, and so on—which could well cause greater annoyance than the texts Modani sent Plaintiff. And these messages may be sent in *any quantity* without *any consent*. By contrast, because of their content, Modani is forbidden by the FTSA to send texts providing information about its credit card that a customer expressly asked for, unless it also makes a litany of hyper-technical written disclosures and obtains the customer's signature. And even then Modani is limited to three messages in 24 hours. Fla. Stat. § 501.616(6)(b).

If the goal is truly to prevent mass text messages that consumers find annoying, the FTSA could have simply banned all automated text messages. But it is hard to see politicians voting for that solution when their own election fundraising depends on automated texts (and prerecorded calls). Of course, the whole point of the First Amendment is that government officials cannot treat their own speech more generously than those of ordinary citizens. And the purpose of an independent judiciary is to protect those citizens' rights when politicians transgress constitutional bounds.

Similarly, the FTSA might have chosen to ban all *commercial* speech using automated texts. What is the justification for prohibiting marketers of consumer goods and services from using automated tools and prerecorded messages, but not other kinds of commercial speakers? The Act's lack of legislative findings leaves it to the Court to guess.

The FTSA is also over-inclusive because "a less restrictive alternative would serve the Government's purpose." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). An obvious alternative would be to require automated texts to include easy options for consumers to opt out (such as by texting back STOP) and to mandate that companies immediately honor such responses. Doing so would allow dissemination of information while leaving customers in control of the messages they receive, rather than preventing consumers from receiving messages that they affirmatively want and ask for, as the statute currently does.

On this point, the FTSA permits using an auto-dialer or playing a recorded message with the "prior express written consent" of the recipient. Fla. Stat. § 501.059(a)(8). That term is defined

7

to require "a written agreement" bearing the recipient's signature and a "clear and conspicuous disclosure" of the terms of the agreement and the consumer's freedom not to sign the agreement as a condition of purchasing any product or service. *Id.* § 501.059(1)(g). But no evidence suggests that a written agreement, or the elaborate disclosure, is necessary to ensure that a consumer's consent is voluntary and knowing. A simple, verbal consent could easily protect consumers just as well, particularly when coupled with an automatic and immediate opt-out mechanism.

Indeed, as this case shows, the FTSA's byzantine prior express written consent requirement could lead to enormous claims by customers who supplied their own phone numbers to companies and *requested* the communications (just not in the prescribed form). It thus encourages private citizens to trick companies into contacting them and then hope for a payoff based on technical violations of the prior express written consent requirement. This scheme, which opens companies up to ruinous liability for sending messages consumers *ask for* (even in writing), is surely not the least restrictive alternative possible to advance consumer protection and privacy. Instead, it's a trap for businesses without large sophisticated legal departments, which have faced hundreds of class action lawsuits since the statute's private right of action was enacted less than a year ago. And it should be struck down under strict scrutiny.

### C. The FTSA Fails Intermediate Scrutiny Because It Is Far More Extensive than Necessary to Accomplish the Government Interest.

Even if intermediate scrutiny applied, the FTSA still could not stand. In *Central Hudson*, the Supreme Court described a three-prong inquiry for assessing regulations of commercial speech that "is neither misleading nor related to unlawful activity": a valid regulation must (1) "directly advance[]" (2) a "substantial" government interest and (3) be no "more extensive than is necessary." *Cent. Hudson*, 447 U.S. at 566. That test is far from toothless, as these cases show, and compels the same conclusion as strict scrutiny—invalidation of the FTSA. *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1236 (11th Cir. 2017) ("the burden is on the government to produce evidence to support" each prong of this three-part test.").

In *Central Hudson* itself, for example, the Supreme Court *struck down* New York's ban on promotional advertising by electrical utility companies. 447 U.S. at 571-72. Although conserving energy was a substantial state interest that was directly advanced by limiting advertising, the regulation failed the third prong about fit. *Id.* at 568-69. That is because some advertising would

8

have been for efficient products and services that do not increase energy usage, and the state could have just "restrict[ed] the format and content of . . . advertising" rather than banning it. *Id.* at 570.

*Sorrell* is similarly instructive. There, the Court determined that Vermont's restriction on selling physician prescribing information for marketing purposes sought "to suppress a disfavored message" and therefore could not survive even intermediate scrutiny. 564 U.S. at 572. Here, too, the FTSA allows certain technologies (using an automated system or a recorded message) "to be . . . used by all but a narrow class of disfavored speakers," *i.e.*, those marketing consumer goods or services. *Id.* at 573. Vermont tried to say its ban protected doctors from harassing sales behavior. *Id.* at 575. But the Court did not see "why remedies other than content-based rules would be inadequate," and it noted that doctors can decline to meet with pharmaceutical sales representatives. *Id.*

The reasoning in *Central Hudson* and *Sorrell* applies with full force to this case, compelling the conclusion that the FTSA is far "more extensive than is necessary" to advance consumer protection or to safeguard consumer privacy. *Cent. Hudson*, 447 U.S. at 566. Indeed, consumers are free to disregard, block, or immediately opt out of unwanted texts. The alternatives mentioned above—such as requiring an automatic opt-out mechanism—would (even better) achieve the FTSA's goals but ban and chill far less speech. Those alternatives would allow messages consumers want and immediately prevent those that they do not—a far better balance under the First Amendment than the clumsy mechanisms the FTSA wields. The law thus fails the tailoring prong for all the same reasons it fails strict scrutiny.

Notably, the courts that have upheld the FTSA did not apply the third prong of *Central Hudson* correctly. In *Turizo*, for instance, the court approved the FTSA's autodialer provision because (1) it limits the use of autodialers but does not outright prohibit them and (2) it leaves open other means of advertisement. 2022 WL 2919260, at *11. Neither rationale is persuasive. That favored speakers can use autodialers, while disfavored speakers cannot, cuts *against* the statute's constitutionality not for it. And focusing on what speech *isn't* prohibited does not affect whether the enacted speech restriction is necessary. Emphasizing that question thus misses the point, as speakers bringing First Amendment challenges *always* have other channels of communication available to them (including in the many cases in which the Supreme Court has struck down the regulation at issue).

9

**V.      Conclusion**

Plaintiff's Complaint relies on a Florida statute that violates the First Amendment through an under- and over-inclusive regime. The FTSA cannot satisfy either strict or intermediate scrutiny because it is far more extensive than is necessary to advance the purported government interest, and it leaves unregulated speech that does far more harm to that purported interest. Accordingly, Plaintiff's FTSA claim should be dismissed with prejudice.

Dated: December 30, 2022.

                              **KABAT CHAPMAN & OZMER LLP**

                              */s/ Matthew A. Keilson*
                              Ryan D. Watstein*
                              Florida Bar Number 093945
                              rwatstein@kcozlaw.com
                              Matthew A. Keilson
                              Florida Bar Number 1002294
                              mkeilson@kcozlaw.com
                              171 17th Street NW, Suite 1550
                              Atlanta, Georgia 30363
                              (404) 400-7300
                              (404) 400-7333 Fax
                              *Lead Counsel
                              *Counsel for Defendant*

## RULE 7.1(3) CERTIFICATION

Because Modani seeks dismissal for failure to state a claim, this motion is exempted from the pre-filing conferral requirements of Local Civil Rule 7.1.(3).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that today, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Matthew A. Keilson
Matthew A. Keilson

*Counsel for Defendant*